**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Marshall,* **Slip Opinion No. 2019-Ohio-670.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2019-OHIO-670

DISCIPLINARY COUNSEL *v*. MARSHALL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Marshall,* Slip Opinion No. 2019-Ohio-670.]**

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct and the Judicial Conduct Rules—A judge is required to respect and comply with the law and act in a manner that promotes public confidence in the integrity and impartiality of the judiciary—Six-month suspension.*

(No. 2018-1433—Submitted January 9, 2019—Decided February 28, 2019.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2018-020.

_____

**Per Curiam.**

{¶ 1} Respondent, William Tierney Marshall, of Portsmouth, Ohio, Attorney Registration No. 0021225, was admitted to the practice of law in Ohio in 1983.

**{¶ 2}** On April 1, 2015, we publically reprimanded Marshall after he pleaded guilty to operating a motor vehicle while intoxicated. *Disciplinary Counsel v. Marshall,* 143 Ohio St.3d 62, 2015-Ohio-1187, 34 N.E.3d 10.

**{¶ 3}** In a formal complaint certified to the Board of Professional Conduct on April 27, 2018, relator, disciplinary counsel, charged Marshall with professional misconduct arising from actions that he took after his 17-year-old daughter, A.M., was pulled over for speeding and for driving with expired tags.

**{¶ 4}** A panel of the board considered the cause on the parties' consent-to-discipline agreement. *See* Gov.Bar R. V(16). The panel and the board recommend that we accept that consent-to-discipline agreement, which includes stipulations of fact, Marshall's admission that he committed a single violation of the Rules of Professional Conduct and multiple violations of the Code of Judicial Conduct, and the parties' agreement that a six-month suspension is the appropriate sanction for his misconduct.

**{¶ 5}** We accept the parties' consent-to-discipline agreement and suspend Marshall from the practice of law in Ohio for six months.

### Stipulated Facts and Misconduct

**{¶ 6}** The parties stipulated that on September 1, 2016, in Scioto County, Sergeant David Stuart of the Ohio State Highway Patrol stopped A.M. for speeding and for having expired tags. When Stuart approached the vehicle, A.M. immediately identified herself and stated that her father was "Judge Marshall." During the stop, A.M. called Marshall on her cell phone and explained to him that she had been pulled over for speeding. A.M. asked Stuart to talk to Marshall. Initially, Stuart declined. But when A.M. handed her phone to Stuart, he took it. Stuart then informed Marshall that A.M. had been stopped for speeding and for having expired tags. Marshall disputed Stuart's assertion that the tags were expired and asked Stuart if he was going to give A.M. a ticket. Stuart stated that he was going to write A.M. a ticket for speeding because she "was running 14 over." Stuart

then attempted to hand the phone back to A.M., but she refused to take it. So Stuart placed A.M.'s cell phone on the dashboard and returned to his patrol car, where he wrote A.M. a citation for speeding. Stuart gave A.M. a warning for the expired tags. Both A.M.'s license and the citation reflected a Jackson County address.

{¶ 7} On September 7, 2016, Marshall instructed his assistant to draft a letter on Scioto County Court of Common Pleas letterhead to Judge Lemons at the Scioto County Juvenile Court. The letter stated:

> Good morning! My daughter, [A.M.], was recently cited for a traffic violation. I understand her license reflects her mother's address, but I am the residential parent, and her current correct residential address is * * * Portsmouth, Ohio 45662.
>
> I'm providing this information to ensure this matter is not transferred to Jackson County. Thank you in advance!

(Brackets and ellipsis added). A.M.'s traffic case was assigned to Magistrate Rebecca Bennett in the Scioto County Juvenile Court.

{¶ 8} Shortly after A.M.'s case had been assigned to Magistrate Bennett, Scioto County Assistant Prosecuting Attorney Jay Willis was in Marshall's courtroom on an unrelated matter. At that time, Marshall attempted to engage Willis in a conversation regarding A.M.'s traffic case. Willis, however, replied that he had not seen A.M.'s case and that he did not want to discuss it. Marshall asked, "What do you guys usually do with these cases?" Willis replied that speeding cases were usually resolved by the payment of a fine and participation in a safety program for juvenile traffic offenders. Marshall then said, "I didn't like the trooper. He didn't listen to me. There used to be a code in this county—I'm a judge and he shouldn't have written my daughter [a ticket]." Willis, who was uncomfortable with the topic, tried to redirect the conversation and eventually decided to just walk

out of the courtroom. Nevertheless, on several other occasions, Marshall continued to make comments to Willis about A.M.'s case and Stuart's behavior. Feeling pressured by Marshall regarding A.M.'s case, Willis asked Scioto County Prosecuting Attorney Mark Kuhn to handle A.M.'s case. Kuhn agreed.

{¶ 9} On October 6, 2016, Marshall appeared with A.M. at her arraignment and, at Marshall's request, the magistrate appointed attorney Eugene Meadows to represent A.M. During an off-the-record conversation, Marshall told the magistrate that "the trooper was rude to him" and that he "wanted to get the trooper in trouble." After several continuances, the court scheduled a pretrial conference for April 4, 2017.

{¶ 10} In general, it is the policy of the Scioto County Juvenile Court to allow only the lawyers representing the parties in the courtroom for pretrial conferences. Prior to A.M.'s pretrial conference, the bailiff asked the magistrate whether she was going to allow Marshall into the courtroom for that conference. The magistrate replied that she was not going to treat A.M.'s case any differently than other cases and that Marshall would not be allowed in the courtroom. Accordingly, when A.M.'s pretrial hearing was about to begin, the bailiff opened the door to the hallway and announced, "Counsel only," and Meadows and Kuhn entered the courtroom. Marshall then approached the bailiff and said, "I'm her father and I'm an attorney, and I'm coming in," and pushed the bailiff's arm out of the way and walked into the courtroom. The magistrate saw the encounter and signaled to her bailiff that it was okay for Marshall to enter the courtroom. After speaking with counsel, the court scheduled another pretrial conference for August 10, 2017.

{¶ 11} On August 10, 2017, before A.M.'s pretrial conference began, Meadows and Kuhn were discussing the case outside the courtroom when Marshall approached them. Referring to Stuart, Marshall interjected, "If he cuts my little girl, I'm going to cut him." During the pretrial conference, which took place off

the record, Marshall stated that Stuart had been unprofessional and had shown him no professional courtesy. The court set A.M.'s final adjudicatory hearing for September 18, 2017.

{¶ 12} Shortly thereafter, and in the presence of other lawyers, Marshall complained to Meadows about Stuart and stated that in future cases before him, he would hold Stuart's behavior against other troopers. Scioto County Assistant Prosecuting Attorney Shane Tieman overheard Marshall's comment and told Marshall that he should not let the actions of one trooper color 30 years of experience with the highway patrol. Marshall responded that he was just joking.

{¶ 13} On September 14, 2017, Marshall told Kuhn that he would like to meet with Stuart. In addition, Marshall told Kuhn that if Stuart agreed to meet, he would have A.M. plead guilty, but if Stuart refused to meet, they would take the case to trial. Marshall also stated that he "wanted to take the trooper back to 1982." When Kuhn indicated that he did not know what Marshall was referring to, Marshall said, "Back when there was professional courtesy [my] daughter would not have received a ticket." Marshall then mentioned that a highway-patrol trooper had recently ticketed a judge and one of Kuhn's employees and that the trooper's behavior warranted Marshall's treating troopers differently in his courtroom. Kuhn disagreed with Marshall's proposal and ended the discussion.

{¶ 14} The next day, assistant prosecuting attorneys Tieman and Pat Apel, Ohio State Trooper Nick Lewis, and defense attorney Rick Nash were outside Marshall's office waiting for a suppression hearing to start in the case *State v. Vinson*, Scioto C.P. No. 17 CR 359A. While everyone was waiting outside his office, Marshall hollered for his secretary to get Stuart on the phone, made derogatory comments about Stuart, and indicated that Stuart had failed to return his previous calls regarding A.M.'s ticket.

{¶ 15} Before the suppression hearing began, however, Apel and Nash had worked out a plea agreement. Consistent with the court's practices, Apel told

Marshall that the case had been resolved. But Marshall stated, "No it hasn't. I don't trust the highway patrol like I used to." Consequently, Apel, Trooper Lewis, and Nash went into the courtroom for the suppression hearing. Once again, Marshall began hollering about Stuart. Tieman then approached Marshall and told him that he should not have called Stuart about A.M.'s case, especially since the matter had been set for a hearing the following Monday. Marshall responded that he was not talking about A.M.'s case in particular, but rather "the perception." Immediately thereafter, Marshall took the bench and forced the parties to conduct the suppression hearing in *Vinson*.

{¶ 16} During the suppression hearing, Apel called Trooper Lewis to the stand and questioned him about the traffic stop that led to Vinson's felony arrest. Lewis testified that he had paced the defendant going 60 mph in a 55 mph zone and that he had observed the defendant commit other traffic violations before pulling the defendant's vehicle over. Marshall interrupted Apel's direct examination of Lewis and began questioning Lewis about the calibration of his speedometer and the condition of the tuning forks that were used to check the calibration. According to the consent-to-discipline agreement, part of the exchange between Marshall and Lewis went as follows:

> [Marshall]:    Are you sure those turning forks are in good order—don't have any chips in or dents or anything like that?
>
> Lewis:  As far as I know, mine radared the uh—
>
> [Marshall]:    Do you have the exact [forks] you used?
>
> Lewis:  I'm sorry?
>
> [Marshall]:    Do you have the exact forks that you used so that we could make sure that your forks are accurate?
>
> Lewis:  I have the forks that are assigned to me by the radio techs that come in and calibrate it—

6

> [Marshall]:   Well then they need to come in and testify to it then, don't they?  So, we'll just take this under advisement at this point.

Marshall then threw down his legal pad and walked off the bench.  The defendant's lawyer, Nash, did not ask any questions, and the case was continued to September 29, 2017.

{¶ 17} On September 18, once again, Marshall made derogatory comments about the highway patrol to Tieman and also noted that prosecutors Kuhn and Apel had done nothing to help change his view of the highway patrol.  By this point, Marshall had directed his assistant to call Stuart on at least two occasions; however, Stuart was on medical leave and had not returned Marshall's calls.

{¶ 18} On September 29, Marshall called in sick to work and as a result, the suppression hearing in *Vinson* was rescheduled for October 27.  On that date, the parties appeared before Marshall on the *Vinson* matter—Trooper Lewis, who had been subpoenaed, also appeared—and again indicated to Marshall that a plea had been worked out.  This time—despite the fact that the terms were identical to the September 15, 2017 plea agreement that Marshall had rejected—Marshall accepted the plea.

{¶ 19} On November 17, 2017, the case against A.M. proceeded to trial before the magistrate.  Before the proceedings against A.M. commenced, the attorneys and Stuart waited outside the courtroom in the hallway.  Marshall approached Stuart and said, "Are you Trooper Stuart?"  Stuart responded, "I'm Sergeant David Stuart, nice to meet you."  Marshall turned away, then looked back at Stuart and said, "Asshole."

{¶ 20} During the fact-finding phase, Kuhn questioned Stuart about A.M.'s traffic stop.  Stuart testified that he had cited A.M. for speeding and had given her a warning for having expired tags.  Marshall then interjected, "It was not a warning.

\* \* \* You did not give a warning." Kuhn objected to Marshall's outburst and the magistrate sustained his objection. On cross-examination, defense attorney Meadows questioned Stuart about the tuning forks and their integrity. Meadows also asked Stuart what he did before he started working for the highway patrol. Stuart questioned the relevancy of the inquiry and Marshall blurted out, "You don't ask questions." The magistrate then admonished Marshall for his behavior and stated, "Okay. Let's set some rules. First of all, Mr. Marshall, you're not to be asking questions." Marshall responded, "Well, I understand; but he's not allowed to be asking questions either." Upon the conclusion of Stuart's testimony, Meadows asked for a short recess.

{¶ 21} Prior to the trial's resuming, Meadows asked Marshall, "You're sure you want to do this?" Marshall replied, "Yes," and took the stand. On direct examination, Marshall claimed that he was qualified to testify as an expert witness in relation to how the condition of a tuning fork could affect a radar reading. Marshall based his asserted expertise on information that he had obtained through his employment as a city prosecuting attorney, a position he last held in 1994. Marshall testified that he had "gone to the State academy on many occasions to be taught how the radar unit works," and that he had "had more education than [Stuart]." In addition, Marshall stated that the best way to determine the condition of the trooper's turning forks would be to bring them into the courtroom. Marshall also commented that the "trooper was rude" and that Stuart was the only trooper that he Marshall had had issues with in his entire career. On cross-examination, Kuhn asked, "And, the question of the trooper being rude here was about whether the citation should have been issued. I mean, in the end, that's what we're talking about. Right?" Marshall responded, "Yes." On redirect, Meadows asked Marshall if he had been able to finish his telephone conversation with the trooper on the day that A.M. was pulled over and Marshall responded in the negative. Meadows then asked Marshall whether he knew why he had not been able to finish his

conversation with the trooper, and Marshall replied, "Because he threw my daughter's phone in her lap."

**{¶ 22}** At the conclusion of the trial, the magistrate was prepared to issue a decision from the bench; however, Kuhn requested that the magistrate issue a written decision and with the consent of Meadows, asked that the court delay issuing the decision. Kuhn explained that he had an upcoming felony criminal matter in front of Marshall and was worried that an adverse decision in A.M.'s traffic case would impact Marshall's actions in the felony criminal case. Over the next several weeks, the magistrate prepared her written decision and presented it to Judge Lemons for his review and signature. In that decision, which was issued on December 20, 2017, the magistrate found A.M. to be a juvenile traffic offender and set the final disposition for January 30, 2018, at 8:45 a.m. in order to accommodate Marshall's schedule.

**{¶ 23}** On January 23, 2018, Marshall called the Scioto County Juvenile Court and asked to speak to the magistrate. Because the decision in A.M.'s traffic case was not yet final, the magistrate hesitated to answer the phone when she saw Marshall's name on the caller ID, but she ultimately decided to answer the call. According to the parties' consent-to-discipline agreement, the following exchange occurred between the magistrate and Marshall:

> [Magistrate]: Hi Judge, are you there?
>
> [Marshall]:    Yes.
>
> [Magistrate]: Sorry, I'm sorry I hesitated a little bit to make sure we were connected. What can I help you with?
>
> [Marshall]:    I just want you to know, have you ever had an expert come in and testify about radar?
>
> [Magistrate]: Judge, this is probably not a conversation we should be having—

> [Marshall]: Have you ever had an expert testify about radar?
>
> [Magistrate]: I know we should not be having this conversation—
>
> [Marshall]: If not, you cannot make that finding. You questioned my credibility. Screw that. Bye.

And Marshall hung up the phone. The magistrate immediately informed Judge Lemons of the call and scheduled a status conference with Meadows and Kuhn for the following day to disclose the nature of Marshall's call. At the status conference, the magistrate disclosed Marshall's telephone call and asked whether the attorneys wanted her to recuse herself from the case. Both Meadows and Kuhn consented to the magistrate's continuing to preside over A.M.'s case.

{¶ 24} On January 30, 2018, A.M. appeared with Meadows and Marshall for the final disposition of her traffic case. Before the magistrate announced the disposition, however, the following exchange occurred:

> [Magistrate]: Okay. All right. Your Honor, is there anything you want to say on your daughter's behalf?
>
> [A.M.]: He's good.
>
> Marshall: She's a good kid and I, you questioned my credibility and that is a problem but I don't get a say.

{¶ 25} The magistrate then adjudicated A.M. a juvenile traffic offender and imposed court costs. Marshall inquired, "Are there points involved in that?" The magistrate responded in the affirmative and Marshall stated, "So I have to pay the insurance for it." Marshall then went on and said, "When I was the Municipal Court Judge, I had to have an expert come in an[d] testify as to the accuracy of the radar

and if you haven't done that, I don't believe you can go forward." The magistrate replied, "Well, those are things to raise in an objection. So, then Judge Lemons will take a look at it. All right. Anything else?" The magistrate then concluded the matter.

{¶ 26} The parties stipulated and the board found that the conduct set forth above violated Jud.Cond.R. 1.2 (requiring a judge to act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary), 1.3 (prohibiting a judge from abusing the prestige of judicial office to advance the personal or economic interests of the judge or others), 2.2 (requiring a judge to uphold and apply the law and to perform all duties of judicial office fairly and impartially), 2.3(A) (a judge shall perform the duties of judicial office without bias or prejudice), and 2.9(A) (prohibiting a judge from initiating, receiving, permitting, or considering ex parte communications, with limited exceptions that do not apply here) and Prof.Cond.R. 8.4(d) (prohibiting a lawyer from engaging in conduct that is prejudicial to the administration of justice).

### Stipulated Sanction

{¶ 27} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 28} As aggravating factors, the parties stipulated that Marshall has a prior disciplinary offense and that he committed multiple offenses in this case. *See* Gov.Bar R. V(13)(B)(1) and (4). The mitigating factors are Marshall's full and free disclosure of his actions and cooperative attitude toward the disciplinary proceeding and his significant involvement in the community and his good character. *See* Gov.Bar R. V(13)(C)(4) and (5). And having acknowledged that his conduct pertaining to A.M.'s case was inappropriate, Marshall resigned from

his position as judge of the Scioto County Common Pleas Court, effective March 16, 2018. *See* Gov.Bar R. V(13)(C)(6).

{¶ 29} The board recommends that we accept the parties' consent-to-discipline agreement and suspend Marshall from the practice of law for six months. In support of its recommendation, the board cites two cases that address the various types of misconduct present in this case—*Disciplinary Counsel v. Hale*, 141 Ohio St.3d 518, 2014-Ohio-5053, 26 N.E.3d 785, and *Disciplinary Counsel v. Hoague,* 88 Ohio St.3d 321, 725 N.E.2d 1108 (2000).

{¶ 30} In *Hale*, the judge unilaterally dismissed a speeding ticket that had been issued to an attorney who was representing Hale in a personal matter, engaged in ex parte communications with the city's chief prosecuting attorney and the attorney to whom the speeding ticket was issued, and subsequently vacated the dismissal entry. For that misconduct, we suspended him from the practice of law for six months.

{¶ 31} In *Hoague,* we imposed a fully stayed six-month suspension on a judge who sent a letter on court letterhead to the owner of a vehicle that he claimed to have observed being driven recklessly. In his letter, the judge stated that the matter was under investigation and threatened further legal action and impoundment of the vehicle unless the owner appeared in his courtroom. When the owner and the person that Hoague had observed driving the vehicle appeared, Hoague interrogated them and threatened to inform their employer about their driving habits. Hoague was later charged with—and convicted of—coercion, a second-degree misdemeanor.

### Disposition

{¶ 32} Because Marshall has a prior disciplinary offense and engaged in multiple offenses, his conduct is more egregious than the conduct at issue in *Hoague*. Indeed, as was imposed in *Hale*, an actual suspension from the practice of law is warranted.

12

**{¶ 33}** Based on the foregoing, we agree that Marshall's conduct violated Jud.Cond.R. 1.2, 1.3, 2.2, 2.3(A), and 2.9(A) and Prof.Cond.R. 8.4(d) and that an actual six-month suspension from the practice of law is the appropriate sanction for that misconduct. We therefore adopt the parties' consent-to-discipline agreement.

**{¶ 34}** Accordingly, William Tierney Marshall is suspended from the practice of law in Ohio for six months. Costs are taxed to Marshall.

Judgment accordingly.

O'CONNOR, C.J., and KENNEDY, FRENCH, FISCHER, DONNELLY, and STEWART, JJ., concur.

DEWINE, J., not participating.

_____

Scott J. Drexel, Disciplinary Counsel, and Joseph M. Caligiuri, Chief Assistant Disciplinary Counsel, for relator.

Montgomery, Rennie & Jonson, L.P.A., and George D. Jonson, for respondent.

_____